# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2002-KA-01853-SCT

*TERRY LEE LATTIMORE a/k/a TERRY L. LATTIMORE, SR.*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/25/2002 |
| TRIAL JUDGE: | HON. MARGARET CAREY-MCCRAY |
| COURT FROM WHICH APPEALED: | WASHINGTON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | WHITMAN D. MOUNGER |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: DESHUN TERRELL MARTIN |
| DISTRICT ATTORNEY: | JOYCE IVY CHILES |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 04/26/2007 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**COBB, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     This case is before the Court on appeal from the judgment of the Washington County Circuit Court which sentenced Terry L. Lattimore to life in prison without parole for capital murder. Lattimore raises issues regarding pre-trial and in-court identification; ineffective assistance of counsel; improper juror communication; prosecutorial misconduct during closing argument; the jury's verdict being against the overwhelming weight of the evidence;

and cumulative error. Finding no reversible error, we affirm the trial court's conviction and sentence.

**FACTS**

¶2.     On the morning of July 16, 2000, James Dycus responded to a knock at his front door. His wife, Virgie, still in bed, heard a "blundering" noise, and then her dog barked, so she went to the front door, which was ajar. Seeing nothing amiss, she went into the kitchen where she could see through the window that her husband was in the yard, talking to a black man. Sensing that something was not right, Virgie Dycus dialed 911just as a second black man rounded the corner and struck her husband's head from behind with a pipe-like object. The second man continued to beat Dycus, and then took his wallet.

¶3.     While on the phone with the dispatcher, Virgie Dycus continued to described the scene as she saw it. She reported that the two men had driven away in a white car. A few minutes later, a neighbor reported a white car traveling at a high rate of speed away from the area. The police found the abandoned getaway vehicle a short distance away, and the vehicle identification number (VIN) showed that it was registered to Terry Lattimore. Dycus died approximately one hour after the assault, and the coroner reported that the cause of death was blunt force trauma to the head.

¶4.     Gary Brown and Terry Lattimore were both arrested for capital murder.[1]   Although

---

[1] The underlying crime was robbery. Evidence was presented that the police found Dycus with his pants pockets turned out, and his wallet, which contained $500 Dycus had recently received from catfish sales, was missing.

they admitted to being at the scene, each implicated the other for the actual killing and claimed to know nothing of the impending crime before it occurred. In Virgie Dycus's initial statement to the deputy sheriff, she described the assailant as being a light skinned, slender black man. She said he was not wearing a shirt and was in his late twenties or early thirties. She identified the other man as merely a tall black man.

¶5. Washington County Public Defender William R. LaBarre, was appointed to represent both Lattimore and Brown, even though the case could potentially impose the death penalty and each had already blamed the other for the murder. Eight days after Dycus's death, a physical lineup was set to be conducted by the Washington County Sheriff's office. The Sheriff's investigator called LaBarre's office and spoke with his assistant, Barbara Ballard,[2] who explained that LaBarre was not available, but she would come over for the lineup. In her presence, and the presence of several others, all of whom were observing through a mirrored window, the officers went forward with the identification process. No counsel was present at this time. Virgie Dycus had no trouble identifying Brown, but "had a little problem picking [Lattimore] out at first because his hair was different." However, once he stepped forward and looked directly toward her, she said unequivocally "that's him," and did not waiver thereafter. The following day, the trial court granted LaBarre's motion to withdraw as Brown's attorney due to a conflict of interest between the two defendants.

---

[2] Ballard was not called by either side as a witness.

3

¶6.    At Lattimore's trial, the state called various witnesses to the stand, including Virgie Dycus, who was the only eyewitness to the murder. When asked whether the man who beat her husband was present in the courtroom, she scanned the audience carefully.[3] Looking methodically around the courtroom, she hesitantly considered one, or possibly two, different bystanders, before ultimately identifying Lattimore, who was sitting at the defense table.

¶7.    Johnnie Brimmage, a neighbor of the Dycuses, was also called to testify. He had seen the two men driving down the road toward the Dycus residence prior to the incident, and said that the second man to get out of the car retrieved an object from the trunk which he carried around to the front of the house. Brimmage said he watched for a few minutes and saw the two men leaving the scene. They waved to him casually as they passed. Neither Lattimore's attorney nor the prosecutor pressed Brimmage about the identity of the second man.

---

[3]The details of what occurred during Mrs. Dycus's in-court testimony were disputed by the defense. After a series of motions before this Court, an order was entered that the audiotapes of the trial be located and returned to the trial court so Lattimore's new appellate attorney could listen to them to assist in preparing the defense appeal. Upon diligent search and inquiry, the tapes could not be located, and we then remanded to the trial court for a hearing to reconstruct the portions of the trial involving Virgie Dycus's in-court identification and the use of the large pipe during the closing argument.

The transcript of that hearing gives no clear indication of the length of time she took to make her identification. Former counsel for Lattimore indicated that she took "between 15 and 30 seconds . . . . to basically scan everybody in the courtroom" before she said "something to the effect of, 'I think that's him over there'" and first pointed to someone who was not Lattimore, although ultimately pointing to Lattimore. On cross-examination, when LaBarre was asked by the prosecutor whether "she pointed out Lattimore within just a few moments after she initially pointed out whoever that was across the courtroom," he responded "I think that's accurate, from my recollection." Lattimore's new counsel called seven witnesses to address the in-court identification issue, including LaBarre and an attorney who was present in the courtroom, who said "I imagine it wasn't 15, 20, 25 seconds, the whole ordeal," and confirmed that she identified Lattimore, after "[t]here was some little confusion, I remember, just a little bit." The other five witnesses were related to Lattimore (two sisters, two nieces, and Lattimore himself).

¶8.    Although the purported murder weapon was never positively associated with the murder through forensic investigation, the prosecution brought out a metal pipe during closing argument and referred to it as he argued.  During the special hearing, several witnesses testified that the prosecutor proceeded to swing the pipe around and drop it loudly on the table.

¶9.    The jury (which had been sequestered during trial) returned a verdict of guilty, and sentenced Lattimore to life in prison without parole.  The day before the sentencing phase ended, a maintenance person came forward, stating that she had a conversation with a juror's boyfriend in which he admitted he had been discussing aspects of the case with the juror at night on a cell phone that she had secreted into the hotel.  The boyfriend denied these allegations, stating that he had been overheard talking about a movie called "The Juror" and that it was a misunderstanding.  He said that he knew he was going to be questioned by the court because someone warned him that morning. After questioning, the juror's hotel room was searched, but no phone was found.  Although the court conducted a hearing on the matter, counsel for the defense did not move for a mistrial.

ANALYSIS

**I.  Motion to suppress evidence of the pre-trial identification**

¶10.    When reviewing a trial court's ruling on the admission or suppression of evidence, this Court must assess whether there was substantial credible evidence to support the trial court's findings. ***Culp v. State***, 933 So. 2d 264, 274 (Miss. 2005).  The admission of evidence

5

lies within the discretion of the trial court and will be reversed only if that discretion is abused. *Id.*

¶11.    There is no question that under the Sixth Amendment, a defendant is entitled to counsel at all proceedings after adversarial proceedings have been initiated against him. *Brooks v. State,* 903 So. 2d 691, 694 (Miss. 2005). Adversarial proceedings are held to have been initiated when a defendant is arrested pursuant to a warrant. *Nicholson v. State*, 523 So. 2d 68, 74 (Miss. 1988).

¶12.    In the present case, the lineup was conducted eight days after Lattimore was arrested pursuant to a warrant. The law enforcement officers should not have conducted the identification proceeding knowing that Lattimore's counsel could not be present. In *Jimpson v. State*, 532 So. 2d 985, 988 (Miss. 1988), a lineup was conducted in order to identify a man accused of armed robbery. Because his counsel was not present at the proceeding, this Court concluded that constitutional error had occurred. *Id.* at 989. This was not the end of the analysis, however. Under the doctrine of harmless constitutional error, the majority opined that: ". . . there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the federal constitution, be deemed harmless, not requiring the automatic reversal of the conviction." *Id.* (*quoting Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)). The Court went on to say that "[a]lthough Jimpson's right to counsel had attached at the lineup, thereby constituting a technical violation of his Sixth Amendment right to counsel, the record is clear

6

that . . .their identification was based on their view of the defendant at [the scene of the crime] and not based on the lineup identification." *Id.*

¶13.    The reasoning utilized in *Jimpson* is likewise applicable to the present case. The lineup itself was constitutional error but not fatal to this case. Lattimore's right to counsel had attached before the lineup was conducted, and thus proceeding with the lineup without his counsel was error. However, it is clear that Virgie Dycus's in-court identification was based upon her view of the defendant at the scene of the crime and not based upon the lineup. Under the standard set forth by the United States Supreme Court in *Chapman,* and followed in *Jimpson,* the conviction was not obtained based upon the lineup, but instead was a result of the in-court identification coupled with other evidence.

¶14.    In ruling on the defendant's motion to suppress, the trial court correctly held that according to the *Jimpson* case, "the Court must still look at the specific circumstances of this case and of the lineup and the identification . . . [t]he Court is going to deny the motion and allow the identification, finding that the identification of this witness is not based on the lineup, and she will be allowed to make the identification in Court." There is no merit to Lattimore's first issue.

### II. In-court identification

¶15.    Where constitutional error in pre-trial identification has occurred, the state must show by clear and convincing evidence that subsequent in-court identifications are not based upon the offensive lineup, but instead have an independent origin. *Gilbert,* 388 U.S. at 271; *York v. State*, 413 So. 2d 1372, 1375 (Miss. 1982). In *Neil v. Biggers*, the U.S. Supreme Court

7

laid out several guiding factors to be used in determining whether the in-court identification is free from the taint of the impermissible lineup. The factors include: the opportunity of the witness to view the criminal at the time of the crime; the witness's degree of attention; the accuracy of the witness's prior description of the criminal; the level of certainty exhibited by the witness at the confrontation; and the length of time between the crime and the confrontation. *Neil v. Biggers*, 93 S. Ct. 375 34 L. Ed. 2d 401, 409 U.S. 188, 199 (1972).

¶16. Although it is preferable for trial courts to make specific findings as to each of these factors, we will look at the totality of the circumstances in determining whether the in-court identification has been impermissibly tainted by a faulty pre-trial lineup. In *Nicholson v. State*, 523 So. 2d 68, 72 (Miss. 1988), we said "an impermissibly suggestive pre-trial identification does not preclude in-court identification by an eyewitness who viewed the suspect at the procedure unless: (1) from the totality of the circumstances surrounding it, (2) the identification was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." (*Citing York v. State*, 413 So. 2d 1372, 1383 (Miss. 1982)). We will support a trial court's finding that an in-court identification was not tainted unless there is no substantial credible evidence supporting such a conclusion. *Outerbridge v. State*, 947 So. 2d 279, 282 (Miss. 2006) (citing *Roche v. State,* 913 So. 2d 306, 310 (Miss. 2005)).

¶17. Applying the *Biggers* factors to the present case, we agree with the trial court's determination that the in-court identification was not tainted, based on the following evidence which was presented at trial.

*Opportunity to view the accused*

¶18.    Virgie Dycus testified that at the time of the attack on her husband, she had a clear view of the  assailants through her kitchen window.  Although she admitted that she was not wearing her bifocals at the time, she testified that her glasses did not affect her vision at a distance.  She further testified that she was able to see Lattimore clearly at the time of the murder, because he looked straight through the window at her, and when he saw her on the telephone, he and the other man ran away.

*Degree of attention*

¶19.    During cross-examination, Virgie Dycus admitted that she was distraught at the time and perhaps was paying more attention to her husband than to his assailants. However, while on the phone with the 911 dispatcher, she was standing at the window, watching the two men as her husband was being beaten.  She said that the man who hit her husband on the head was slender, had a light complexion, and was not wearing a shirt.

*Accuracy of prior description*

¶20.    Virgie Dycus was consistent from the time she first described Lattimore on the day of the murder until the day of trial that Lattimore was a slender, light-skinned black man with short hair.  She could not say definitely that his hair was braided on the day of the murder, but it was hanging long on the day of the lineup.

*The level of certainty exhibited by the witness at the confrontation*

¶21.    Virgie Dycus successfully picked out Lattimore and Brown during the pre-trial lineup.[4]  She recognized Brown immediately, but hesitated momentarily before identifying Lattimore, since his hair was longer than it was on the day of the murder.  Once he stepped forward and looked straight ahead into the mirrored window behind which she was standing, she immediately said "[t]hat's him."

¶22.    We conclude that substantial credible evidence supports the judgment of the trial court with regard to both the pre-trial and in-court identifications of Lattimore.  These issues are without merit.

### III. Ineffective assistance of counsel

¶23.    Lattimore asserts that he was given ineffective assistance of counsel in violation of his Sixth Amendment rights. In support of this contention, he argues that the public defender assigned to his case: (1) represented both Brown and him at the lineup stage, thus constituting a conflict of interest; (2) failed to fully investigate the case by interviewing all key witnesses;  (3) failed to move for a new trial upon learning of possible juror misconduct; and (4) failed to move for a mistrial after the state's closing argument and Virgie Dycus's in-court identification.

¶24.    The test to be applied for ineffective assistance of counsel was established in *Strickland v. Washington*, 104 S. Ct. 2052, 80 L. Ed. 2d 674, 466 U.S. 668 (1984), where

---

[4]Neither Brown nor Lattimore disputes that he was present when Dycus was beaten to death.  However, each claimed the other actually struck Dycus with the pipe and killed him.

the United States Supreme Court determined that the benchmark is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having a just result. *See Brawner v. State*, 947 So. 2d 254, 260 (Miss. 2006) (citing *Leatherwood v. State*, 473 So. 2d 964, 968 (Miss. 1985)). However, there is a strong presumption that the attorney's conduct falls within the wide range of reasonable professional conduct and strategy. *Leatherwood*, 473 So. 2d at 969. There is also a presumption that all decisions made during the course of trial were strategic. *Id.* In order to prove that counsel was deficient, a defendant must show that counsel's performance was deficient, and that the deficient performance prejudiced the defense. *Id.* at 968. Reviewing the actions of his counsel through this lens, we conclude that Lattimore's claims are without merit.

*Conflict of Interest*

¶25. The public defender was assigned to represent both Lattimore and Brown after both men made statements implicating the other. This concurrent representation was an obvious conflict of interest which existed at the time of the pre-trial lineup. *See Littlejohn v. State*, 593 So. 2d 20, 23 (Miss. 1992). When an attorney represents co-defendants with adverse positions, the issue is not a question of counsel's competency, but of counsel's loyalty. *Id.* Had the attorney continued the dual representation, the Sixth Amendment violation would have tainted the trial proceeding. As it was, however, alternate counsel was appointed for Brown soon after the lineup occurred. Thus Lattimore had competent, unconflicted counsel at all times from that point forward. The initial conflict, which existed for a short time when

11

no assistance was given which could adversely affect either client, does not render Lattimore's counsel ineffective under *Strickland*.

*Failure to Investigate*

¶26.   Lattimore next argues that his trial counsel failed to adequately depose Johnny Brimmage, the Dycuses' neighbor, and that this omission directly resulted in his conviction. In *Woodward v. State*, 843 So. 2d 1, 18 (Miss. 2003), this Court stated that: "A defendant who alleges that trial counsel's failure to investigate constituted ineffectiveness must also state with particularity what the investigation would have revealed and specify how it would have altered the outcome of the trial." Lattimore asserts that, had trial counsel sufficiently interrogated Brimmage, testimony would have surfaced tending to show that Brown, not Lattimore, was the murderer.  With only Virgie Dycus's identification to contradict Brimmage's testimony, Lattimore argues that the jury would have found him innocent.  The jury did send out two notes requesting a copy of Brimmage's testimony during their deliberations, and both requests were denied by the trial court.  The jury was unable to come to a verdict on the first day and deliberated overnight.

¶27.   Although Brimmage was a key witness in this case, trial counsel made a judgment call and chose not to elicit any additional information regarding the killer.  Counsel did cross-examine Brimmage, asking him about the make of the getaway vehicle and also attempting to impeach him by showing he was intoxicated at the time of the crime.  However, the fact that  Brimmage was not asked certain questions about the killer's identity does not render counsel's services ineffective.

12

*Motion For New Trial*

¶28.    Trial counsel has the responsibility to make all appropriate post-trial motions. *See*

*Holland v. State*, 656 So. 2d 1192, 1198 (Miss. 1995).  Lattimore argues that his trial counsel

failed to move for a new trial after a hearing was conducted regarding juror misconduct.

Though counsel certainly could have moved for a new trial at the conclusion of this hearing,

we have not held that, without more, such an omission amounts to ineffective counsel.

Lattimore has made no viable showing that, had counsel made said motion, the trial court

would likely have ruled in his favor.  Thus, this issue is without merit.

*Failure to Object or Move For Mistrial*

¶29.    Finally, Lattimore asserts that his counsel was ineffective in failing to object to Virgie

Dycus's in-court identification and to certain remarks made by the state during closing

argument.  Judicial review of an attorney's trial tactics must be highly deferential to counsel.

*Powell v. State*, 806 So. 2d 1069, 1077 (Miss. 2001).  Contrary to Lattimore's argument, trial

counsel did, in fact, make a timely objection to the identification.  After the identification

trial counsel approached the bench and stated that: "We would object to her identification at

this point."  The court determined that it would allow the record to "reflect that the last

person that she–the person that she made the last statement concerning--was the defendant."

*Id.*  Counsel also approached the bench at the conclusion of Virgie Dycus's testimony

regarding a possible suggestion given by her family after she pointed to the wrong person.

Although arguably counsel should have moved for a mistrial at this point, Lattimore

presented no evidence showing that the trial court would likely have granted such motion.[5]

Whether the event occurred is not clear, but what is clear is that the only specific accusation comes from Lattimore himself. There is no showing that the court would have given Lattimore a new trial based upon his own self-serving testimony. In addition, other mistrial motions were made throughout the trial, proving that counsel was active in representing and protecting the rights of his client.

¶30.    During closing arguments, the state brought out a metal shaft the investigation had uncovered from the scene of the crime. Several times, the prosecution referred to the shaft as if it were the murder weapon, although no evidence of blood or DNA was found positively linking the object to the murder.[6]  At the hearing to supplement the record, several members of Lattimore's family testified that the prosecutor swung the pipe around and banged it on the table, actions which Lattimore claims were calculated to infuriate the jury. Lattimore points to his attorney's failure to object to these actions as evidence that his counsel was

---

[5] The only testimony specifically concluding that any such suggestion took place came from Lattimore. His attorney was unsure of whether the incident occurred, stating that "It is possible that some signals were given to--I'm not sure if it was Mrs. Dycus. I think it was to Mrs. Dycus either by her family members or someone associated with the state." At the subsequent hearing to supplement the record, none of the other witnesses, all of whom were members of Lattimore's family, could say with certainty that Mrs. Dycus's family had in any way pointed out Lattimore.

[6] Specifically, the prosecutor said "[w]hen you get back there, you men feel this pipe this piece of shaft is what it is– and you see the heft of that. And you just think about it don't take but one lick with that to put you down. I don't care who you are. You can knock down a mule with this thing. And then repeatedly hitting him in the head. No. There's no accident here. No."

ineffective. Again, such an omission does not necessitate a finding that counsel was insufficient. In hindsight, an objection to such conduct might have been reasonable, but *Strickland* is not so stringent as to require that all reasonable motions and objections be made in order for counsel to be deemed competent.

¶31. Although Lattimore's attorney could have made several additional objections and motions, overall, trial counsel was vigilant in representing his client. He filed pre-trial motions to suppress certain evidence, and made numerous objections and motions during the course of the guilt phase. The right to effective counsel does not entitle the defendant to have perfect counsel, only competent counsel. *Davis v. State*, 897 So. 2d 960, 966-67 (Miss. 2004) (*citing Stringer v. State*, 454 So. 2d 468, 476 (Miss. 1984)).

¶32. We conclude that the public defender's overall performance was within the realm of suitable performance; thus Lattimore's claims of ineffective counsel are not borne out in the record.

### IV. The state's introduction of a metal pipe as the purported murder weapon

¶33. It was unnecessary for the state to prove that the lead pipe, found under the van at the crime scene, was the actual weapon used in the commission of the murder. *See Rhodes v. State*, 676 So. 2d 275, 283 (Miss. 1996). When there is evidence that the weapon could have caused the injury, and some connection between the defendant and the weapon exists, the object is deemed relevant and admissible. *Id.* (citing *Ethridge v. State*, 418 So. 2d 798 (Miss. 1982) and *Stokes v. State*, 518 So. 2d 1224, 1227 (Miss.1988)).

15

¶34. The holding in *Rhodes* is applicable to the case at bar. There, a man died from gunshot wounds which were initially thought to be self-inflicted. No autopsy was conducted until nine years later, when his wife was finally prosecuted for his murder. The state recovered a gun from the attic of the house, similar to the one found on the scene. The new owner of the house testified that on the day of the grand jury indictment, Rhodes had called asking for the gun and told her not to tell anyone about it. When the state attempted to admit it into evidence, the defense objected, stating that there was no evidence directly linking the gun to the crime. This Court concluded that, because it was possible that the gun was the one used in the crime and there was evidence linking it to the defendant, it was sufficiently relevant and thus admissible.

¶35. Similarly, in this case, there was ample evidence linking the weapon to the crime. The prosecution introduced Lattimore's own statement, which the defense did not seek to suppress. After admitting to being at the scene, Lattimore claimed that he saw Brown dispose of the pipe used in the murder under a nearby van.[7] The autopsy revealed that Dycus's death was caused by blunt-force trauma to the head. Although there were no DNA samples, blood, or fingerprints, the experts concluded that the wound could have been caused by the pipe. Thus, ample proof existed for a jury to conclude that the metal pipe introduced

_____

[7] Virgie Dycus also stated that she had seen the killer wipe down the object and toss it under the van, however, this evidence did not surface until a few days before trial. The prosecution voluntarily agreed not to introduce the testimony as it was untimely. At trial, the groundwork for the pipe's admission into evidence was made through the introduction of Lattimore's statement instead.

by the state was the murder weapon. The defense presented no evidence to the contrary, thus this issue is also without merit.

## V. Juror misconduct

¶36.    Immediately after the sentencing phase of the trial, several court personnel came forward with information regarding possible juror misconduct by Latoya Batteast. The trial court sua sponte conducted a hearing on the matter in which both sides questioned the witnesses. During the inquiry, the court reporter and two maintenance persons stated that they had seen Malcom Morris, the juror's boyfriend, in the hallway waiting for Batteast to be relieved of her duties. There was testimony that Morris said he had spoken to her, via cell phone, during deliberations, and that she had informed him the trial would be ending soon. When asked about this statement, he offered the weak explanation that he had been talking about a movie in which one of the jurors has a cell phone. During questioning, Morris admitted to talking to his girlfriend once, but said it was with the bailiff's permission. Batteast denied talking to Morris at all. A search of Batteast's bags revealed no cell phone. There was no testimony or other evidence that any discussion of the merits of the case or any attempt was made to improperly influence Ms. Batteast in any way. Assuming arguendo that the telephone conversations occurred, such telephone contact with Morris was clearly wrong. However, the trial court heard the contradictory testimony and found no cause for a new trial. What this Court is asked to determine is whether her ruling constitutes reversible error, and we conclude that it does not.

17

¶37.     Most of our contemporary case law addresses sequestration violations in cases where the crime was not a capital offense. In *Weaver v. State*, this Court held that: "[t]here is a presumption that jurors follow the instructions of the court relative to their conduct during the course of a trial . . . in the absence of any evidence to the contrary we could not say that a defendant in a case less than capital was prejudiced by separation of the jury." *Weaver v. State*, 272 So. 2d 636, 638 (Miss. 1973).

¶38.     As early as 1870, however, Mississippi courts have zealously guarded the integrity of the jury verdict in those cases where death was a possible penalty. In the words of *Woods v. State*: "Jurors are as open to prejudice from persuasion as other men; and neither convenience, comfort nor economy ought to be consulted, in order to guard against it. When selected to perform the important duties of jurors, they are withdrawn from the crowd, and must, necessarily, be subjected to some wholesome legal restraints for the purpose of guarding them against improper influences, and to secure that confidence in the honesty and purity of their action, so essential to the administration of justice." *Woods v. State*, 43 Miss. 364, 369 (Miss. 1870).

¶39.     That the defense failed to raise such an issue at the trial court level does not bar this Court from considering the matter at the appellate level. The trial court proceeded properly, upon being made aware of potential juror misconduct, and  heard testimony to determine what, in fact, happened and whether there was any improper influence warranting a new trial. We pause here, however, to remind the trial court that in *Gladney v. Clarksdale Beverage Co.,* 625 So. 2d 407, 418-19 (Miss. 1993), we "set out the procedure for trial judges to

18

employ in alleged juror misconduct cases." *Id* at 418. Although neither party nor the trial court cited *Gladney*, a review of the record reveals that the proper course of action was taken after the trial court was made aware of potential juror misconduct. First, the court considered whether an investigation was warranted. In order for the duty to investigate to arise, the party alleging misconduct "must make an adequate showing to overcome the presumption in this state of jury impartiality." *Id.* at 419.

> At the very minimum, it must be shown that there is sufficient evidence to conclude that good cause exists to believe that there was in fact an improper outside influence or extraneous prejudicial information . . . . Although a minimal standard of a good cause showing of specific instances of misconduct is acceptable, the preferable showing should clearly substantiate that a specific, non-speculative impropriety has occurred. The sufficiency of such evidence shall be determined by the trial court if a post-trial hearing is indeed warranted under these standards. *Id.*

Once the trial court determined that communication was made and the nature of the communication, its duty was to decide whether it was reasonably possible that this communication altered the verdict. *Id.* Without using the specific words of *Gladney*, the trial court obviously decided that Batteast's cell phone calls, if made, did not alter the verdict.

¶40. We have found no precedent in our case law which specifically addresses the misconduct presently at issue. Lattimore argues that in *Wilson v. State*, this Court determined that not only may this Court hear the complaint, but it is reversible error when even one juror is separated and potentially subjected to outside influences in a capital case. *Wilson v. State*, 248 So. 2d 802, 805 (Miss. 1971). No showing of prejudice is required. *Id.* However this reliance is misplaced. In *Wilson,* after the first day of trial, the court allowed

19

the jury to disperse and go to their respective homes for the night. There is a significant difference in dispersing a capital jury for the night and one juror making a telephone call to a boyfriend. However, let there be no mistake. We in no way condone such misconduct and care should always be taken to prevent it.

¶41. Here, evidence was presented showing that Batteast willfully violated the court's sequestration instructions, therefore, unlike other cases this court has seen, this issue is not predicated upon mere speculation. The only evidence to the contrary came from Batteast and Morris, both of whom had every reason to lie as they were facing contempt of court charges. While there are a small number of exceptions to the rule of strict sequestration, none of these apply to the case at bar. *See* **Glass v. State**, 278 So. 2d 384, 387 (Miss. 1973) (new trial denied when jury, in manslaughter case, was allowed to go to the restrooms, in the company of bailiffs). On the record before us, we find no error in the manner in which the trial court handled this matter, nor in its ruling.

### VI. The state's closing argument

¶42. During closing argument, the state, in recounting the identification of Lattimore by Virgie Dycus, said that "you remember Mrs. Dycus testified that the man with no shirt on, his hair was shorter. It was fixed, fixed shorter, put up somehow." At this point, the defense objected, claiming that the prosecution was assuming facts not in evidence. The trial court denied counsel's motion for a mistrial. Lattimore now appeals this issue, stating that the motion should have been granted due to the state's egregious misrepresentation. We do not agree.

20

¶43.   Virgie Dycus testified on cross examination that she described the killer as "the fellow that didn't have on a shirt, and he was tall, and at that time, he had his hair fixed short, and he was–he wasn't real, real dark complexion."   Because the testimony was indeed in evidence, elicited by the defense itself, there is no merit to Lattimore's argument.

### VII. Overwhelming weight of the evidence

¶44.   When reviewing a denial of a motion for a new trial, which challenges the weight of the evidence, we will disturb a verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable justice. *Latiker v. State*, 918 So. 2d 68, 72-73 (Miss. 2005) (citing *Herring v. State*, 691 So. 2d 948, 957 (Miss. 1997)).

¶45.   In this case, Lattimore admitted to being at the scene of the crime.   The defense presented no evidence in its case-in-chief to prove that Brown, not Lattimore, was the actual murderer.   Although the defense attempted to impeach each of the prosecution's witnesses, the jury ultimately found the prosecution's case to be more believable. Based upon eyewitness testimony and circumstantial evidence, the verdict cannot be said to constitute an "unconscionable justice."   This issue is without merit.

### VIII. Cumulative error

¶46.   As all of the foregoing assignments of error have been found to be without merit, we find there is no cumulative error.   *Branch v. State*, 882 So. 2d 36, 58 (Miss. 2004). Lattimore's argument that reversal is warranted on the basis of cumulative error is without merit.

21

## CONCLUSION

¶47. The Washington County Circuit Court did not err in its rulings on the issues raised by Terry L. Lattimore, and we affirm his conviction and sentence.

¶48. **CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IMPRISONMENT, WITHOUT THE POSSIBILITY OF PAROLE, IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.**

**SMITH, C.J., WALLER, P.J., EASLEY, CARLSON, DICKINSON AND RANDOLPH JJ., CONCUR. DIAZ, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY GRAVES, J.**

**DIAZ, JUSTICE, DISSENTING:**

¶49. Because the majority's facts and legal reasoning are fundamentally flawed as to the identification of the defendant and the juror misconduct, I must dissent.

**I. Virgie Dycus Failed to Identify Lattimore as Her Husband's Attacker.**

¶50. I cannot join the opinion of the majority because it does not acknowledge the failure of Virgie Dycus to identify Terry Lattimore as the murderer of James Dycus. In addition, I must respectfully dissent in deference to precedent of this Court and the United States Supreme Court, which forbids allowing the flawed pretrial identification of Lattimore into evidence.

**A. The In-Court Identification of Terry Lattimore is Critically Flawed and Constitutes Reversible Error.**

22

¶51. On July 16, 2000, Virgie Dycus frantically dialed 911. She told the operator that "two n-----s are killing my husband." When asked for a description, she said simply that the men were black, both tall, and that one was shirtless.

¶52. The investigating police officer testified that her initial description was similarly vague. She told him what she had relayed to the 911 operator, that one man was tall, black, and shirtless, but was unable to give a description of the other man as she was quite understandably "very upset." Mrs. Dycus also failed to identify the weapon used to attack her husband. During her 911 call she described the weapon as a stick. Speaking to the police later, she admitted that it could have been a pipe, or a baseball bat.

¶53. While these facts most certainly call into question the State's ability to meet the *Biggers* factors, it is the in-court identification by Mrs. Dycus that slams the lid shut on any argument that she could independently identify Terry Lattimore.

¶54. The prosecutor conceded that the in-court identification of Lattimore by Mrs. Dycus failed utterly. "[W]e all made a big joke about it," he admitted to the trial court. In an order, the trial judge set the scene:

> It took Mrs. Virgie Dycus approximately two (2) minutes to make an in-court identification of the defendant. When asked by the Assistant District Attorney, Tucker Gore, whether the man that she had identified in earlier testimony as the person she saw beating her husband was in the courtroom, Mrs. Dycus slowly scanned the entire courtroom from right to left, beginning with jurors in the jury box (to her immediate right). She initially pointed over the Defendant's head at a person in the audience wearing a blue shirt. After a pause, she changed her response by pointing at the Defendant who was wearing a white shirt and tie. **Two (2) minutes elapsed from the time of the initial question through the designation of Defendant in response.**

23

¶55.   Mitchell Creel was an attorney sitting in the audience who, at one point during the two minutes, Mrs. Dycus pointed out as her husband's attacker.  However, there is at least one important difference between attorney Creel and Mr. Lattimore:  Creel happens to be white.

¶56.   As he testified:

Q:      Would you simply, and to the best of your recollection, tell the Court what transpired during the identification process.

A:      When Mr. Gore asked the witness to identify, "Is the defendant in the courtroom today," I believe she responded, "Yes."  "Would you point out the defendant?"

And at that point, for whatever reason, I don't know if it was age or whatever, she slowly began to look across the courtroom, starting with the jury box first, which really caught my attention because it just seemed unusual, from my profession.  Usually those identifications are done immediately.

But anyway, she goes around carefully and looks at everybody, a bunch of people in the courtroom.  And without quoting the specific language she used, she pointed in my direction, or in that direction.  And it's been awhile.  I truly can't remember the specifics.  I know she pointed in my direction.
. . . .

Q:      And did you feel at any point she was pointing actually at you?

A:      I mean, she pointed in my direction.  But, I mean, it's kind of hard for me to feel or take it serious when clearly myself knew that I had nothing to do with this crime.

**Q:      You and Mr. Lattimore are not of the same race, is that correct?**

**A:      No.**

Q:      Would you describe Mr. Lattimore as somewhat light-skinned?

24

A: Mr. Lattimore is a light-skinned African-American. I'm a white Caucasian. A difference in height and size. Certainly a difference. Creel admitted that he "thought it was kind of comical almost."

¶57. Four other witnesses gave similar testimony. The other man Mrs. Dycus identified as her husband's murderer was a dark-complexioned black man. Again, Lattimore has a light complexion.

¶58. If the charade had ended at this point it would have been troubling enough. Yet the trial judge had to be informed of one last fact: Mrs. Dycus only identified Lattimore after her family began pointing at him. Three witnesses testified that Mrs. Dycus looked to her family for help after failing to identify the "correct" defendant.

¶59. Even after settling upon Lattimore–whom she clearly did not recognize–Mrs. Dycus was unsure.

Q: I see you're pointing. Could you describe who you are pointing at?

A: I believe it's the one that's in the blue shirt back there. He's not sitting here. Wait – wait a minute. That's him right there I do believe. No. As I say, I've been having trouble.

Q: Take your time.

A: I still say I believe that that's him best as I can recall.

Q: And you're pointing at whom?

A: That one.

Q: Describe what he has on?

A: Pardon?

Q: Describe what he has on?

25

A:     A white shirt and a tie.

Q:     And where is he seated?

A:     Pardon?

Q:     Where – where is he in the courtroom?

A:     Right there at the end of the table.

Q:     Are you sure?

A:     I think I'm sure.

Q:     Are you sure?

A:     He looks more like him than anybody else in here that I can see.  Let's put it that way.

Lattimore's attorney objected to the identification to no avail.

¶60.   It is undeniably clear that, from the moment Mrs. Dycus dialed 911 to the day of trial, she had no grasp of who attacked her husband other than that it was a shirtless black man. We cannot blame Mrs. Dycus for not being able to identify her husband's attacker; the moment was horrific, and even if she were not under enormous stress, eyewitness identifications are notoriously shaky.  "The vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification." ***United States v. Wade***, 388 U.S. 218, 228, 87 S. Ct. 1926, 1933, 18 L.Ed.2d 1149, 1158 (1967). However, we cannot condemn a man to life in prison when we are not extremely sure that he is the one with blood on his hands.  The trial court should not have allowed the in-court identification to be entered into evidence.

26

**B.** **The State's Burden of Proving Independence of In-Court Identifications is Incorrect.**

¶61. The opinion incorrectly concludes that a "totality of the circumstances" test should be applied to in-court identifications which follow an improper pretrial lineup. This is neither the law of Mississippi nor the United States of America. Rather,

> A participant in a lineup has a right to have a lawyer present only if criminal proceedings have been instituted against him. If the right is violated, the prosecution will be permitted an in-court identification by the eyewitnesses who viewed the proscribed lineup only upon a showing by *clear and convincing evidence* that the in-court identifications are based upon observations of the suspect other than the lineup identification.

*York v. State*, 413 So. 2d 1372, 1383 (Miss. 1982) (citing *United States v. Wade*, 388 U.S. 218, 18 L. Ed. 2d 1149, 87 S. Ct. 1926 (1967)). *See also* *Frisco v. Blackburn*, 782 F.2d 1353, 1355 (5th Cir. 1986) (reiterating that the burden is on the prosecution to establish basis of in-court identification by clear and convincing evidence); *Green v. State*, 377 So. 2d 618, 620 (Miss. 1979) (holding that the State must meet a "heavy burden of proving by clear and convincing evidence the independence of [the witness's] proposed in-court identification").

¶62. For its position, the majority relies upon *Nicholson v. State*, 523 So. 2d 68, 71 (Miss. 1988), a case which deals with the question of whether the pretrial identification was "impermissibly suggestive." That is not the claim made by Lattimore in this case. The majority also claims that *Outerbridge v. State*, 947 So. 2d 279 (Miss. 2006), stands for the proposition that "we will support a trial court's finding that an in-court identification was not tainted unless there is no substantial credible evidence supporting such a conclusion." Yet both *Outerbridge* and the case it cites, *Roche v. State*, 913 So. 2d 306, 310 (Miss. 2005),

27

concern *pretrial identifications*. Accordingly, the "substantial credible evidence" standard is not applicable to the in-court identification issue.

¶63. When a criminal defendant is completely denied counsel at a pretrial lineup, the state must meet a higher burden of proof than when the lineup is simply alleged to be suggestive. *Compare Wade*, 388 U.S. 218, 18 L. Ed. 2d 1149, 87 S. Ct. 1926 (holding that denial of counsel at lineup requires state to prove independence of in-court identification with "clear and convincing evidence") *with Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977) (holding that a "totality of the circumstances" test must be applied to in-court identifications following suggestive pretrial lineups). The reason for this distinction is because, without counsel, "there is grave potential for prejudice, intentional or not, in the pretrial lineup, which may not be capable of reconstruction at trial and . . . presence of counsel itself can often avert prejudice and assure a meaningful confrontation at trial." *Brooks*, 903 So. 2d at 695 (quoting *Wade*, 388 U.S. at 236, 87 S. Ct. at 1937, 18 L. Ed. 2d at 1162).

¶64. As discussed *supra*, the trial record does not reflect that the prosecution was able to establish the basis of Mrs. Dycus's questionable in-court identification by "clear and convincing evidence." Accordingly, the trial court committed reversible error by allowing the identification.

### C. The Admission of Mrs. Dycus's Pre-trial Identification Is Reversible Error.

28

¶65. The majority never concludes whether admission of the pretrial identification was error. Instead, the opinion quotes the trial court's ruling allowing Mrs. Dycus to make an *in-court* identification. Assuming that the majority finds the admission of the pretrial identification harmless error, I must respectfully dissent on this issue.

¶66. The majority correctly finds that Lattimore's Sixth Amendment right to counsel was violated when his attorney was absent from the pretrial lineup. Yet, I cannot agree that this constitutional violation was "not fatal to this case."

¶67. In **Gilbert v. California**, 388 U.S. 263, 273, 87 S. Ct. 1951, 1957, 18 L. Ed. 2d 1178, 1186 (1967)**,** the United States Supreme Court held that when a criminal defendant is denied the right to counsel at a pretrial lineup, "[t]he State is therefore **not** entitled to an opportunity to show that that testimony had an independent source. Only a **per se exclusionary rule** as to such testimony can be an effective sanction to assure that law enforcement authorities will respect the accused's constitutional right to the presence of his counsel at the critical lineup." (emphasis supplied); *see also* **Brooks v. State**, 903 So. 2d 691, 694-697 (Miss. 2005) (quoting **Gilbert**). Accordingly, it was clear error for the trial court to admit evidence of the pretrial identification, and the majority's reliance that "Dycus's in-court identification was based upon her view of the defendant at the scene of the crime and not based upon the lineup," has no relevance to whether the *pretrial* identification was admissible.

¶68. Second, the error cannot be harmless where this was the *only* evidence tending to show it was Lattimore, and not the suspect Brown, who committed the murder. Harmless error requires that we "declare a belief that [admission of the pretrial identification] was

29

harmless *beyond a reasonable doubt*." *Gilbert*, 388 U.S. at 274 (emphasis supplied) (quoting

*Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 828, 17 L. Ed. 2d 705, 711 (1967)).

In other words, "[t]he question is whether there is a reasonable possibility that the evidence

complained of might have contributed to the conviction." *Fahy v. Connecticut*, 375 U.S. 85,

86-87, 84 S. Ct. 229, 230, 11 L. Ed. 2d 171, 173 (1963).

¶69.     Because Mrs. Dycus was the only eyewitness to the attack, her testimony was crucial

to the State's case.  This is especially true because Brown was subsequently acquitted for the

crime of which Lattimore was found guilty.  As discussed at length *supra*, Mrs. Dycus had

extreme difficulty in identifying Lattimore; indeed, she *de facto* failed to identify him.  The

pretrial identification she offered played a substantial role in his eventual conviction.  For as

the United States Supreme Court recognized in *Gilbert*, "the witness' testimony of [her]

lineup identification will enhance the impact of [her] in-court identification on the jury and

seriously aggravate whatever derogation exists of the accused's right to a fair trial." 388 U.S.

at 273-74.  Accordingly, the majority's comparison to *Jimpson v. State*, 532 So. 2d 985, 989

(Miss. 1988), where the amount of other evidence was "overwhelming," is completely

unfounded.

¶70.     I am also mindful that, as Justice Dickinson recently warned, "[t]he phrase harmless

beyond a reasonable doubt has now become synonymous with harmless error analysis, but

this Court's current usage of that phrase has set it loose from its original moorings." *Haynes*

*v. State*, 934 So. 2d 983,  994 (Miss. 2006) (Dickinson, J., dissenting, joined by Waller and

30

Cobb, P.J.J., and Graves, J.). We cannot continue to allow this misuse of the phrase "harmless."

¶71. Because admission of the pre-trial identification substantially contributed to Lattimore's conviction, it was not harmless error, and I would reverse.

**II. The Violation of the Sequestered Jury Requires a New Trial.**

¶72. Our rules of court dictate that "[i]n any case where the state seeks to impose the death penalty, the jury shall be sequestered during the entire trial." Miss. U.R.C.C.C. Rule 10.02. The violation of a sequestration order in a capital case requires automatic reversal. *Wilson v. State*, 248 So. 2d 802 (Miss. 1971) (violation of the sequestration rule in capital cases affects a fundamental right and requires automatic reversal). *Compare King v. State*, 580 So. 2d 1182, 1187 (Miss. 1991) (distinguishing sequestration violations in non-capital cases). For "[t]he separation of even one juror in such cases is an irregularity which will vitiate the verdict." *Wilson*, 248 So. 2d at 804 (internal citations omitted). This was the common law rule long before we adopted Rules of Court. *See Boles v. State*, 21 Miss. 398, 402, 13 S. & M. 398 (Miss. 1850) ("where the jurors depart from the bar, a bailiff must be sworn to keep them together, and not suffer any one to speak with them . . . Any departure from it is a violation, and leads to confusion and difficulty in which there is no rule of law to guide us").

¶73. There are only two exceptions to this bright-line rule in non-capital cases: (1) where it was highly improbable that the juror saw anyone while separated; and (2) where the juror was necessarily separated because of illness and saw no one but a doctor. *Clark v. State*, 209 Miss. 586, 48 So. 2d 127 (Miss. 1950) (citing *Cunningham v. State*, 94 Miss. 228, 48 So.

31

297 (Miss. 1908); *Haley v. State*, 123 Miss. 87, 85 So. 129 (Miss. 1920)). Obviously, neither exception applies in the present case.[8]

¶74. The case at hand was riddled with violations of the sequestered jury. The events encircle one juror, Latoya Batteast. There is ample evidence that Batteast spoke with her boyfriend nightly and that they discussed the outcome of the trial. Indeed, the evidence of misconduct by Batteast was so strong that the trial court ordered that she be furnished with an attorney, and testimony was heard regarding her misconduct.

¶75. The court reporter brought to the trial judge's attention that a man had been heard talking to one of the jurors on a cell phone. The trial court held a hearing in chambers. A member of the maintenance staff, Laverne Askew, testified to the court that Batteast had nightly telephone contact with her boyfriend, Malcolm Morris, throughout the trial. Morris allegedly bragged about having knowledge about the deliberations of the jury. Specifically, Askew testified that she overheard Morris say, "I been talking to my wife on the phone. She's on the jury. And it ain't going to be long . . . it ain't going to be long and we'll be out of here."[9]

Another witness, Shirley Roberts, testified that Batteast had talked to Morris:

Roberts:    Well, he was talking about the jury, what was going on. He said that his wife had been calling him every night. She had a cell phone in there.

---

[8]Strangely, the majority recognizes that "none of these [exceptions] apply to the case at bar," but goes on to say in the very next sentence that it finds no error.

[9]There is no evidence that the two were married, although Morris refers to Batteast as his "wife."

32

Court:      Did he say that?

Roberts:    Yes.  He said that there was two people in the jury, which was his wife and another guy–from my understanding I think he meant the white guy that was on the jury–that voted against–they didn't agree with the verdict. They disagreed with it, and they were the only two that disagreed with the jury before the verdict came out.

Court:      And did he say anything else?

Roberts:    No.  Just he was saying that she just didn't believe–you know, the evidence that they were giving to them, that it didn't sound –

. . . .

Defense:    Ms. Roberts, how long a time did you talk with him?  How long did you talk with him?

Roberts:    I stay in the hall outside from the–10 or 15 minutes.  He had a phone call.  His cell phone was ringing.  Had that funny sound like some type of music.  He had a conversation on the phone. They must of asked him where he was.  He said he was still at the courthouse.  He got off the phone he was–saying that it was messed up, the verdict was messed up, and that it was not going to–as she did – he also said that he know for a fact that they not going to do the legal objection [sic]–you know, the verdict.[10]

Reporter:   I'm sorry?

Roberts:    **He said that he knows for a fact that they are not – they said they are not going to vote on behalf of a conviction**.

Court:      Did he say how he knew that?

Roberts:    **He said he talk to his wife every night**.

---

[10]The witness possibly meant "lethal injection," not "legal objection."

33

¶76. Batteast and Morris admitted they had contact with each other, but both denied that she owned a cell phone.[11] Their testimony conflicted; Batteast denied ever having telephone contact with Morris, but did admit that she saw him when he came to give her clothing. In contrast, Morris testified that Batteast telephoned him, and not her mother, to acquire clothing. As the majority acknowledges, Morris provided the trial court with a ridiculously "weak explanation" for the telephonic contact he had with the juror:

> Judge, we had a conversation yesterday [about a movie]. Anybody rent it. It's at Blockbuster. "Jury Duty" is the name of the movie. It's a man on jury duty, his wife is up for murder, and he's got a cell phone contacting, he's hanging the jury up on purpose. He's contacting everybody. Go rent it. It's on sale right now. He's contacting everybody getting – calling out whose in the jury, and they killing them one by one. That's all the conversation we had about a phone being brought up yesterday.

¶77. Morris also repeatedly contradicted his own testimony and admitted he lied to the trial court. When asked how he knew to come to the court, he first said, "the newspaper said it plain as day Friday, court should be getting–getting the case today," and that he was Batteast's "only ride." However, when asked, "is that why you're here today," Morris answered, "[t]hat's why I'm here today. And to be honest – to be honest with that, **no, that's not really why I'm here today, because really the reason I'm here because someone contacted me and told me that I supposed to been said something about my wife had a phone**." Morris testified that one of the maintenance staff telephoned him and told him he

---

[11]As discussed below, our case law and rules of evidence prohibit a juror from testifying about her own misconduct. M.R.E. 606(b); *Gladney v. Clarksdale Beverage Co.*, 625 So. 2d 407, 414 (Miss. 1993) (citing *Schmiz v. Illinois Central Gulf R.R. Co.*, 546 So. 2d 693, 695 (Miss. 1989)).

34

was "in trouble." However, he later waffled and said that "she [the maintenance staff] didn't call me or nothing," but rather had spoken to him in person. This pattern of constant duplicity was characteristic of Morris.

¶78.    Batteast was also forewarned that she would be brought before the trial court to explain her alleged misconduct. After hearing testimony from the maintenance staff, the trial judge called in an attorney to represent Batteast for possible contempt of court charges. The judge told the attorney, "I wanted you to have an opportunity to speak with her before I take steps to have her things searched, because I do believe that the Court has probable cause to do that." The judge then released the other jurors but ordered that Batteast remain.

¶79.    Indeed, Batteast's service to the jury started bizarrely and had already warranted concern by the trial court.   After she was selected for jury duty, Batteast began crying and told the bailiff she did not want to serve. The trial judge noted this was "an unusual reaction" and called Batteast in for questioning, at which time the juror voiced concerns about finding childcare for her three children. A few days later, the juror's mother came to the court. The trial judge stated that " her mother came back with four children with her and was furious and demanded to speak to me. I did not know what was going on. And said, 'See, these children are her children, and I don't know what's going to happen to them because I have to work' . . . . Blah, blah, blah. And the juror sat on the steps outside and went out and started crying again."[12]

---

[12]While Batteast indicated that she had three children, her mother apparently informed the trial court she had four.

¶80. There was clear evidence of repeated misconduct in this case that this Court cannot overlook. The majority's attempt to distinguish the present case from *Wilson* is in direct contradiction to this Court's own words in that case. *Wilson*, 248 So. 2d at 804. It makes no difference whether one juror or all twelve have improper contact outside the venire. *Id.* (internal citations omitted). By holding otherwise, the majority overrules a century and a half of Mississippi law. *Boles*, 21 Miss. 398; *Organ v. State*, 26 Miss. 78, 1 Morr. St. Cas. 684 (Miss. 1853); *Clark*, 209 Miss. 586; *Wilson*, 248 So. 2d 802.

**III. Even Under the Majority's New Standard, the Trial Court Committed Error.**

¶81. In reversing the bright-line sequestration rule in capital cases, the majority adopts the standard set forth in *Gladney v. Clarksdale Beverage Co.*, 625 So. 2d 407, 414 (Miss. 1993) and finds "no error in the manner in which the trial court handled this matter, nor in its ruling." Contrary to the majority's assertion, the trial court made no findings of fact or law on this issue, and simply did not follow the procedures set out in *Gladney*.

¶82. First, the majority holds that under *Gladney* it was the trial court's duty "to decide whether it was reasonably possible that this communication altered the verdict." However, the judge made no determination as to whether the juror's violation of the sequestration order warranted a mistrial. She stated only that her "concern was preserving whatever evidence there may be on this issue." The defendant did not raise the issue at trial or in his post-trial motions, and it is simply untrue that "the trial court obviously decided that Batteast's cell phone calls did not alter the verdict." Because the trial court never issued a ruling on the matter, it failed to fulfill its required duty.

36

¶83.   Second, *Gladney* makes repeatedly clear that "jurors will not be heard to give evidence as to their own misconduct, but will be heard to give evidence concerning the misconduct of others calculated to be influential to the verdict." *Id.* at 414 (citing *Schmiz v. Illinois Central Gulf R.R. Co.*, 546 So. 2d 693, 695 (Miss. 1989)).   This same rule is clearly set out in our Rules of Evidence:

> [A] juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to absent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.

M.R.E. 606(b).  Accordingly, the trial court also erred in asking Batteast to testify regarding her own misconduct.

¶84.   Our trial courts need and deserve clear standards, especially when fundamental constitutional rights are implicated.  *See Turner v. Louisiana*, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965) (holding that juror misconduct violates a defendant's Sixth Amendment right to an impartial jury); *Parker v. Gladden*, 385 U.S. 363, 87 87 S.Ct. 468, 17 L.Ed.2d 420 (1966) (holding that juror misconduct may also violate a defendant's Sixth Amendment right to confront witnesses against him).  Today's holding provides little direction for trial judges who may be faced with juror misconduct in capital cases.

## Conclusion

¶85.   Because I find multiple grounds for reversible error in both the identification procedure and the juror misconduct, I must dissent.

**GRAVES, J., JOINS THIS OPINION.**